**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CONFEDERATED TRIBES OF SILETZ
INDIANS OF OREGON; SMOKEY POINT
HARDWOOD, INC.,
             *Plaintiffs,*

              and

ROSS-SIMMONS HARDWOOD LUMBER
COMPANY, INC.,
             *Plaintiff-Appellee,*

              v.

WEYERHAEUSER COMPANY,
             *Defendant-Appellant.*

Nos. 03-35669
          03-35984

D.C. No.
CV-00-01693-OMP

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, Senior District Judge, Presiding

Argued and Submitted
December 6, 2004—Portland, Oregon

Filed May 31, 2005

Before: Thomas G. Nelson and Johnnie B. Rawlinson,
Circuit Judges, and William W Schwarzer,*
Senior District Judge.

Opinion by Judge T.G. Nelson

---

*The Honorable William W Schwarzer, Senior United States District
Judge for the Northern District of California, sitting by designation.

**COUNSEL**

Stephen V. Bomse, M. Laurence Popofsky and Heather N. Leal, Heller Ehrman White & McAuliffe LLP, San Francisco, California, for the appellant.

Michael E. Haglund, Haglund, Kelley, Horngren & Jones, LLP, and Roy Pulvers, Lindsay, Hart, Neil & Weigler, LLP, Portland, Oregon, for the appellee.

---

**OPINION**

T.G. NELSON, Circuit Judge:

Ross-Simmons Hardwood Lumber Company brought this action against Weyerhaeuser Company for antitrust violations under Section 2 of the Sherman Act.[1] Ross-Simmons alleged that Weyerhaeuser monopolized and attempted to monopolize the Pacific Northwest input market for alder sawlogs through its purchases of sawlogs. Ross-Simmons prevailed in a jury trial on both its monopolization and attempted monopolization claims. After trebling the jury's damages award, the court entered judgment for Ross-Simmons and denied Weyerhaeuser's motion for judgment as a matter of law or for a new trial. The court also awarded attorneys' fees and costs to Ross-Simmons. Weyerhaeuser appeals the court's denial of its motion for judgment as a matter of law or for a new trial, and seeks reversal of the judgment. Weyerhaeuser also separately appeals the district court's award of attorneys' fees and costs to ensure that any reversal of the judgment or remand for a new trial would also result in reversal of the award of

---

[1]15 U.S.C. § 2. Section 2 of the Sherman Act provides, in relevant part, that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty" of an antitrust violation. *Id.*

attorneys' fees and costs. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.   BACKGROUND

The forests west of the Cascade Mountains in Oregon and Washington contain sufficient hardwood to support the only concentration of hardwood sawmills in the western United States. These mills are part of what is often called the "alder industry" after the area's predominant hardwood species, which accounts for 95% of the annual Pacific Northwest hardwood lumber production. The three principal players in the alder portion of the hardwood industry are: (1) timberland owners and loggers who supply alder sawlogs; (2) production facilities, including sawmills, that buy sawlogs and process them into finished alder lumber; and (3) purchasers who buy hardwood lumber from production facilities. Both parties in this case fall under the second category: they operate sawmills.

The plaintiff-appellee, Ross-Simmons Hardwood Lumber Company, was a pioneer in the alder lumber business, starting in 1962. It operated its mill in Longview, Washington continuously until it went out of business in 2001. From 1990 to 1997, Ross-Simmons experienced modest prosperity, but from 1998 to 2001, its production declined. From 1998 to 2001, sawlog prices increased while finished lumber prices decreased. This was unusual: historically, the price of alder sawlogs fluctuated with the price of finished lumber. Because its materials costs went up and its production went down, Ross-Simmons incurred losses totaling nearly $4.5 million, forcing it to shut down in 2001. Ross-Simmons blamed its failure on Weyerhaeuser.

The defendant-appellant, Weyerhaeuser Company, was established in 1900. In 1980, it acquired Northwest Hardwoods, Inc. (also "Weyerhaeuser"), and now owns six hardwood sawmills in the Pacific Northwest. Weyerhaeuser is one

of the largest manufacturers of hardwood lumber in the world. From 1998 to 2001, the period in which Ross-Simmons's profits dropped, Weyerhaeuser's share of the Pacific Northwest market for alder sawlogs was approximately 65%.

Ross-Simmons alleged that Weyerhaeuser artificially increased sawlog prices to drive Ross-Simmons and other competitors out of business. At trial, Ross-Simmons offered testimony and other evidence to prove that Weyerhaeuser attempted to eliminate competitors by driving up sawlog prices and restricting access to sawlogs through: (1) predatory overbidding (i.e., paying a higher price for sawlogs than necessary); (2) overbuying (i.e., buying more sawlogs than it needed); (3) entering restrictive or exclusive agreements with sawlog suppliers; and (4) making misrepresentations to state officials in order to obtain sawlogs from state forests. Weyerhaeuser attributed Ross-Simmons's failure to substandard equipment, inefficient operations, poor management, and inadequate capital investment.

The court instructed the jury on the applicable law, including the elements of both monopoly and attempted monopoly, the law regarding anticompetitive conduct in the form of predatory overbidding, and the issue of damages. With respect to overbidding, the court instructed the jury that, if it found that Weyerhaeuser paid higher prices than necessary for sawlogs, the jury could regard that as an anticompetitive act. The jury found for Ross-Simmons on both the monopolization and attempted monopolization claims, and awarded damages of $26,256,406. After trebling the damages award, the court entered judgment in the amount of $78,769,218 against Weyerhaeuser. The court then denied Weyerhaeuser's motion for judgment as a matter of law or for a new trial, and awarded attorneys' fees and costs to Ross-Simmons.

Weyerhaeuser appeals the judgment, arguing that: (1) it is entitled to judgment as a matter of law because it had no market power in the alder sawlog market and the alleged anticom-

petive acts were not actionable under § 2 of the Sherman Act, (2) it is entitled, in the alternative, to a new trial because the jury instructions misstated the law of predatory overbidding, and (3) it is entitled to reversal of the judgment because Ross-Simmons's damages theory was speculative. Weyerhaeuser also appeals the court's grant of attorneys' fees and costs to Ross-Simmons so that any reversal of the judgment or remand for a new trial would also result in reversal of the award of attorneys' fees and costs.

## II.  ANALYSIS

Weyerhaeuser's challenges to the court's denial of its motion for judgment as a matter of law or for a new trial present us with a legal question of first impression: whether the prerequisites set forth in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*[2] for establishing liability in sell-side predatory pricing cases apply in cases where a defendant engages in buy-side predatory bidding by raising the cost of inputs. We address this legal issue at the outset, applying a de novo standard of review.[3] For the reasons discussed below, we conclude that *Brooke Group* does not control in the buy-side predatory bidding context at issue here.

Our conclusion that *Brooke Group* does not apply here disposes of Weyerhaeuser's challenge regarding a new trial due to erroneous jury instructions in its entirety. The court properly instructed the jury regarding predatory overbidding. Our holding that *Brooke Group* is inapplicable also partially resolves Weyerhaeuser's challenge regarding judgment as a matter of law. Because Weyerhaeuser further contends that the evidence was insufficient to support the jury's verdict, we must examine that contention, however. After doing so, we

---

[2]509 U.S. 209 (1993).

[3]*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986) (stating that we review questions of law de novo).

conclude that substantial evidence did support the jury's finding of attempted monopolization. Thus, we affirm the court's denial of Weyerhaeuser's motion for judgment as a matter of law or for a new trial.

Two issues remain unresolved after we address the issue related to *Brooke Group*. They are: (1) damages, and (2) attorneys' fees and costs. We resolve them as follows. First, we uphold the jury's award of damages because it was based upon an appropriate estimate of damages. Second, we conclude that the court properly granted attorneys' fees and costs in favor of Ross-Simmons. Accordingly, we affirm.

## A.   ISSUES RELATED TO *BROOKE GROUP*

### 1.   Inapplicability of *Brooke Group*

[1] Monopoly power exercised on the buy-side of the market is called "monopsony" power, and can violate § 2 of the Sherman Act.[4] Both sides of the market affect allocative efficiency, and hence consumer welfare.[5] Antitrust laws are thus concerned with competition on the buy-side of the market as much as on the sell-side of the market.[6]

---

[4]*See United States v. Syufy Enters.*, 903 F.2d 659, 663 n.4 (9th Cir. 1990) (*"Syufy II"*); Roger D. Blair & Jeffrey L. Harrison, Monopsony: Antitrust Law and Economics at 68-81 (1993) (discussing monopsonist behavior that violates the Sherman Act).

[5]*See* Blair & Harrison, *supra* note 5, at 36-61 (explaining the social welfare losses that result when a dominant buyer or collusive buyers set a non-optimal price for inputs).

[6]*See, e.g.*, *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 227, 235-36 (1948) (explaining that price fixing by a buyer's cartel violates §§ 1 and 2 of the Sherman Act); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 801-04 (1946) (stating that a conspiracy to increase prices of cheaper tobacco and thereby drive out manufacturers of lower-priced cigarettes violated § 2 of the Sherman Act); *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1298 n.5 (9th Cir. 1983) (discussing that a conspiracy to bid more for logs to drive competitors out was

**[2]** Weyerhaeuser argues that, regardless of whether a case involves sell-side predatory pricing or buy-side predatory bidding, the same standard of liability should apply. Weyerhaeuser invites the court to borrow the standard of liability set forth in *Brooke Group*, a sell-side predatory pricing case. In *Brooke Group*, the Court created a high standard of liability, holding that a plaintiff bringing a claim under § 2 of the Sherman Act based on predatory sell-side pricing must show that: (1) "the prices complained of are below an appropriate measure of its rival's costs," and (2) "a dangerous probability" existed that the rival would later "recoup[ ] its investment in below-cost prices" once it stopped such pricing.[7] Thus, to establish liability under *Brooke Group*, a plaintiff had to show that its competitor operated at a loss and was likely to recoup its losses. Weyerhaeuser contends that the same standard should apply in buy-side predatory bidding cases. Specifically, Weyerhaeuser argues that the jury instructions were erroneous because the court did not instruct the jury that overbidding for sawlogs could be anticompetitive conduct only if Weyerhaeuser operated at a loss and a dangerous probability of its recoupment of losses existed.[8] Similarly, Weyerhaeuser argues that, as a matter of law,[9] the alleged

---

anticompetitive conduct); *Nat'l Macaroni Mfrs. Ass'n v. FTC*, 345 F.2d 421, 426-27 (7th Cir. 1965) (holding that an agreement of macaroni producers to reduce the amount of durum wheat purchased as an input for pasta production was per se unlawful); *see also* Blair & Harrison, *supra* note 5, at 68-81 (discussing cases).

[7]*Brooke Group*, 509 U.S. at 222, 223-24.

[8]The relevant jury instruction, as finally formulated, stated:

> One of Plaintiffs' contentions in this case is that the Defendant purchased more logs than it needed or paid a higher price for logs than necessary, in order to prevent the Plaintiffs from obtaining the logs they needed at a fair price. If you find this to be true, you may regard it as an anti-competitive act.

[9]*Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993) (stating that the issue of "whether specific conduct is anticompetitive in violation of the Sherman Act is one of law").

predatory overbidding was not actionable anticompetitive conduct under the Sherman Act because Ross-Simmons did not satisfy the two *Brooke Group* requirements. We reject Weyerhaeuser's arguments regarding the applicability of *Brooke Group*.

The *Brooke Group* Court established a high liability standard for sell-side predatory pricing cases because of its concern with the facts that consumers benefit from lower prices and that cutting prices often fosters competition.[10] The Court stated that "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition."[11] The Court further recognized that above-cost pricing is either "competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting."[12] As a result, the Court did not want to make the standard of liability "so low that antitrust suits themselves became a tool for keeping prices high."[13]

[3] We recognize that in buy-side predatory bidding cases, as in sell-side predatory pricing cases, the price level itself is the anticompetitive weapon. However, an important factor distinguishes predatory bidding cases from predatory pricing cases: benefit to consumers and stimulation of competition do not necessarily result from predatory bidding the way they do from predatory pricing.[14] We turn now to the short-term and long-term effects of predatory bidding.

---

[10]*Brooke Group*, 509 U.S. at 223, 226.

[11]*Id.* at 223 (internal quotation marks and citation omitted).

[12]*Id.* (citation omitted).

[13]*Id.* at 226-27.

[14]*See Wash. Alder LLC v. Weyerhaeuser Co.*, 2004 WL 1717650, at *1 (D. Or. July 27, 2004) ("Consumers don't benefit from higher raw material prices, or by logs rotting in the lumber yard. Nor is deliberately driving log prices up, simply to deprive competitors of logs, likely to be confused with legitimate competition."); John B. Kirkwood, *Buyer Power*

In a predatory bidding scheme, a firm pays more for materials in the short term, and thereby attempts to squeeze out those competitors who cannot remain profitable when the price of inputs increases.[15] No consumer benefit results during this predation period if the firm raises or maintains the same price level for its finished products. Although consumers might temporarily benefit if a firm lowered prices during the predation period, a reduction in prices would place even greater pressure on competitors, thereby increasing the threat to competition arising from the predatory bidding.[16] Thus, even though a short-term benefit to consumers might occur in some predatory bidding situations, serious concerns about the threat to competition would concurrently arise in those situations. Moreover, predatory bidding claims do not directly

---

*and Exclusionary Conduct: Should* Brooke Group *Set the Standards for Buyer-Induced Price Discrimination and Predatory Bidding?*, 72 ANTI-TRUST L.J. 625, 655 (2005) ("[I]t seems indisputable that any negative impact of a predatory bidding case on downstream price competition is less direct and less certain than the impact of a predatory pricing case, which is a direct assault on a seller's decision to lower prices to its customers."); *id.* at 667 (stating that "because predatory bidding cases attack a firm's decision to increase prices, not reduce them, they do not represent a direct assault on price cutting"); Richard O. Zerbe, Jr., *Monopsony and the Ross-Simmons Case: A Comment on Salop and Kirkwood*, 72 ANTI-TRUST L.J. 717, 724 (2005) (stating that consumer harm can be presumed in the instant case because it involves "a limited, relatively inelastic, resource-based input market [for alder logs] and a much broader output market"). *But see* Steven C. Salop, *Anticompetitive Overbuying by Power Buyers*, 72 ANTITRUST L.J. 669, 702 (2005) (stating that "[t]he difficulty of distinguishing an anticompetitive overbuying strategy from a competitive purchase expansion can be similar to the difficulties in predatory pricing matters" and that in some situations, "it may be difficult for a court to know whether the firm is attempting to predate or simply competing in the input market with rivals who are also purchasing the inputs").

[15]Kirkwood, *supra* note 15, 72 ANTITRUST L.J. at 652.

[16]In this case, the price of finished lumber decreased while the cost of sawlogs increased during the alleged predation period. It is unclear from the record whether lumber prices decreased because of a decision Weyerhaeuser made, or for other reasons.

challenge a firm's decision to cut prices; instead, they focus on a firm's decision to raise the cost of inputs. Therefore, the concerns the *Brooke Group* Court expressed about depriving consumers of the temporary benefit of low prices do not necessarily apply when predatory bidding is at issue.[17]

In the long run, to carry out a predatory bidding scheme successfully, a firm would have to recoup the higher costs it had paid for its materials. If it succeeded in driving out competition, during this recoupment period the firm would likely pay less for its materials while charging consumers a higher price.[18] The firm would have little incentive to pass on the benefit of lower input prices to consumers when it possessed greater market power and needed to recoup the higher costs it had paid for its materials. Thus, the overall effect of a predatory bidding scheme would result in harm to consumers.[19]

[4] Although in some situations rising input prices might encourage new companies to enter the supply side of the market and expand output, thereby increasing innovation and efficiency so that consumers benefit in the long run through price decreases and product improvements, this is not such a situation. The nature of the input supply at issue here does not readily allow for market expansion. The evidence shows that, during the alleged predation period, the supply of alder sawlogs remained relatively stable or declined. Nothing suggests this situation will change — alder sawlogs are "a natural resource of limited annual supply in a relatively inelastic market."[20] Thus, at least in this case, predatory bidding is less likely than predatory pricing to result in a benefit to consum-

---

[17]*See Brooke Group*, 509 U.S. at 223, 226-27.

[18]*See* Kirkwood, *supra* note 15, 72 Antitrust L.J. at 653.

[19]We note that the recoupment phase of a predatory bidding scheme mirrors the recoupment phase of a predatory pricing scheme. *See id.*

[20]*See* Zerbe, *supra* note 15, 72 Antitrust L.J. at 722 (explaining that the alder sawlog market is "highly inelastic," in part because the alder harvest is a byproduct of the more important softwood harvest).

ers or the stimulation of competition. As a result, the concerns that led the *Brooke Group* Court to establish a high standard of liability in the predatory pricing context do not carry over to this predatory bidding context with the same force. Therefore, the standard for liability in this predatory bidding case need not be as high as in predatory pricing cases. Accordingly, we hold that the high standard of liability in *Brooke Group* does not apply here because this case involves predatory bidding in a relatively inelastic market, not predatory pricing.

Our decision in *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*[21] provides further support for our holding today that the prerequisites in *Brooke Group* do not apply here. Although the Supreme Court decided *Brooke Group* after we decided *Reid Bros.*,[22] *Brooke Group* involved a different factual situation and did not overrule *Reid Bros.*[23] In *Reid Bros.*, we affirmed a finding of liability under § 1 of the Sherman Act that was based in part on a predatory buying claim.[24] The plaintiff in *Reid Bros.* argued that the defendants conspired to bid preclusively on timber sales at higher prices than necessary to block the plaintiff from buying necessary timber.[25] The defendants argued that the district court erred by finding predatory bidding when there was no evidence that the high prices paid for timber would prevent the defendants from covering their marginal costs on the ultimate sale of the processed timber.[26] We rejected the defendants' argument and held that

---

[21]699 F.2d 1292.

[22]*See United States v. Gay*, 967 F.2d 322, 327 (9th Cir. 1992) (stating that we must view our decisions in light of intervening Supreme Court decisions closely on point).

[23]*See Brooke Group*, 509 U.S. at 214-16.

[24]*Reid Bros.*, 699 F.2d at 1297-98. Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . , or conspiracy[ ] in restraint of trade or commerce." 15 U.S.C. § 1.

[25]*See Reid Bros.*, 699 F.2d at 1297-98.

[26]*Id.* at 1298 n.5.

such a "blind application of a numerical test would only frustrate the intent of the Sherman Act."[27] This statement that a rigid, numerical test should not apply when a buy-side over-bidding scheme was at issue further supports our holding that *Brooke Group* is inapplicable here. Thus, our conclusion that *Brooke Group* does not apply is consistent with our precedent. We now turn to the effect our conclusion has on Weyerhaeuser's arguments for a new trial and for judgment as a matter of law.

## 2. New Trial

[5] We generally review a court's ruling on a motion for a new trial for an abuse of discretion.[28] However, because Weyerhaeuser's motion for a new trial rested solely on the ground that the jury instructions misstated the law regarding Ross-Simmons's overbidding claim, we review the court's denial of the motion for a new trial de novo.[29] Because we hold today that *Brooke Group* does not govern in this case, the court did not need to instruct the jury that overbidding for sawlogs could be anticompetitive conduct only if Weyerhaeuser operated at a loss and a dangerous probability of Weyerhaeuser's recoupment of its losses existed. The instructions as a whole provided sufficient guidance regarding how to determine whether conduct was anticompetitive.[30]

---

[27]*Id.*

[28]*Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 886 (9th Cir. 2002).

[29]*Costa v. Desert Palace, Inc.*, 299 F.3d 838, 858 (9th Cir. 2002) (en banc) (stating that "we generally review the formulation of instructions for an abuse of discretion, but whether an instruction misstates the law is a legal issue reviewed de novo"), *aff'd*, 539 U.S. 90 (2003). Whether we review the denial of a new trial under the abuse of discretion standard or de novo standard matters little here because " '[a] district court by definition abuses its discretion when it makes an error of law.' " *See Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1426 (9th Cir. 1996) (quoting *Koon v. United States*, 517 U.S. 81, 100 (1996)), *aff'd*, 526 U.S. 687 (1999).

[30]The court instructed the jury regarding anticompetitive conduct as follows:

Moreover, the instructions were consistent with Supreme Court precedent stating that a defendant violates the Sherman Act by using monopoly power " 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.' "[31] Thus, the jury instructions "fairly and adequately cover[ed] the issues presented, correctly state[d] the law, and [we]re not misleading."[32] Accordingly, we affirm the court's denial of Weyerhaeuser's motion for a new trial.

---

Anti-competitive conduct is conduct that has the effect of wrongly preventing or excluding competition, or frustrating or impairing the efforts of other firms to compete for customers within the relevant market, making it very difficult or impossible for competitors to engage in fair competition. Not everything that enables a company to gain or maintain a monopoly is anti-competitive.

In deciding whether conduct is anti-competitive, you should consider whether the conduct lacks a valid business purpose, or unreasonably or unnecessarily impedes the efforts of other firms to compete for raw materials or customers, or if the anticipated benefits of the conduct flow primarily from its tendency to hinder or eliminate competition. Anti-competitive conduct does not include ordinary means of competition, such as offering better products or services, exercising superior skill or business judgment, utilizing more efficient technology, better marketing, or exercising natural competitive advantages such as unique geographic access to raw materials or markets.

. . . .

One of Plaintiffs' contentions in this case is that the Defendant purchased more logs than it needed or paid a higher price for logs than necessary, in order to prevent the Plaintiffs from obtaining the logs they needed at a fair price. If you find this to be true, you may regard it as an anti-competitive act.

[31]*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992) (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)).

[32]*See Mockler v. Multnomah County*, 140 F.3d 808, 812 (9th Cir. 1998) (internal quotation marks and citation omitted).

### 3.  Judgment as a Matter of Law

"We review [the] district court's denial of [the] motion for judgment as a matter of law de novo."[33] Our holding regarding the inapplicability of *Brooke Group* resolves one of the issues related to Weyerhaeuser's challenge to the denial of judgment as a matter of law: Weyerhaeuser's contention that, as a matter of law, the alleged predatory overbidding could not be actionable anticompetitive conduct under § 2 of the Sherman Act because Ross-Simmons did not show that Weyerhaeuser operated at a loss and that a dangerous probability of Weyerhaeuser's recoupment of its losses existed. Because *Brooke Group* does not apply in this case, Ross-Simmons did not have to meet the high standard of liability in *Brooke Group* before relying upon predatory overbidding to satisfy the anticompetitive conduct requirement. Our holding regarding *Brooke Group* does not resolve Weyerhaeuser's argument that Ross-Simmons's evidence was insufficient to support the jury's verdict, however. Accordingly, we now turn to the issue of whether substantial evidence supports the jury's verdict.[34] We conclude that the record contains substantial evidence.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[35] When reviewing the record as a whole, we must draw all reasonable inferences in favor of the nonmoving party, keeping in mind that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[36] In reviewing

---

[33] *Janes*, 279 F.3d at 886 (italics omitted).

[34] To uphold the jury's verdict, we must find that substantial evidence supports it. *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999).

[35] *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 992 (9th Cir. 1986) (internal quotation marks and citation omitted) (*"Syufy I"*).

[36] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

a defendant's entitlement to judgment as a matter of law in the antitrust context, we presume that "a reasonable jury . . . know[s] and understand[s] the law, the facts of the case, and the realities of the market."[37]

[6] To establish attempted monopolization under § 2 of the Sherman Act,[38] Ross-Simmons had to demonstrate that Weyerhaeuser: (1) engaged in predatory or anticompetitive conduct, (2) had a specific intent to monopolize, and (3) a dangerous probability of Weyerhaeuser's achievement of monopoly power in the relevant market existed.[39] Additionally, Ross-Simmons had to show causal antitrust injury.[40] We first examine whether the record contains substantial evidence of anticompetitive conduct.

###    a.    Anticompetitive conduct

[7] Anticompetitive or predatory acts are those that tend to exclude or restrict competition "on some basis other than efficiency."[41] The record contains substantial evidence of over-

---

[37]*See Brooke Group*, 509 U.S. at 243.

[38]Because the court instructed the jury separately regarding monopolization and attempted monopolization, and the jury entered separate liability verdicts on each of the counts, we can affirm the judgment if substantial evidence supports the jury's verdict as to either claim. *See Del Monte Dunes*, 95 F.3d at 1426 (stating that the court could affirm the judgment on either of two alleged violations when the district court instructed the jury that it should award damages to the plaintiff if it found for the plaintiff on any alleged violation). We conclude below that substantial evidence supports the jury's verdict on the attempted monopolization claim. Therefore, we do not address the monopolization claim.

[39]*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1432-33 (9th Cir. 1995).

[40]*Rebel Oil*, 51 F.3d at 1433. Weyerhaeuser does not address this element, presumably because if Ross-Simmons's theory that high sawlog prices drove it out of business is viable, Ross-Simmons has satisfied the injury element. Thus, we do not discuss it.

[41]*See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (internal quotation marks and citation omitted).

bidding for sawlogs to support the jury's finding of anticompetitive conduct. The evidence shows that during the period of alleged predation: (1) sawlog prices increased while prices for finished lumber decreased, (2) Weyerhaeuser had a dominant share of the market for alder sawlogs and an ability to control alder sawlog prices, (3) Weyerhaeuser suffered declining profits due to the high prices it was paying for raw materials, and (4) Weyerhaeuser employed a strategy of raising sawlog prices. Based on this evidence, the jury could reasonably have concluded that Weyerhaeuser engaged in anticompetitive conduct by overbidding for sawlogs. We need not analyze whether substantial evidence supports the other alleged anticompetitive acts because the evidence of predatory overbidding sufficiently supports the finding that Weyerhaeuser engaged in anticompetitive conduct.[42] We now turn to the issue of whether substantial evidence supports the jury's finding of specific intent.

### b. Specific intent

Attempted monopolization requires proof of intent to monopolize or eliminate competition.[43] The record contains substantial evidence of specific intent to eliminate competition based on: (1) Weyerhaeuser's anticompetitive conduct itself, (2) the testimony of Weyerhaeuser's employees, and (3) Weyerhaeuser's business projections regarding sawlog prices.

[8] Anticompetitive conduct alone can satisfy the specific intent requirement if the conduct "form[s] the basis for a substantial claim of restraint of trade" or is "clearly threatening

---

[42]See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 736 (9th Cir. 1999) (affirming judgments of liability on defamation claims where two of the three statements upon which jury verdicts were based were not actionable as a matter of law). The other alleged anticompetitive acts were: overbuying sawlogs, entering into exclusive agreements for sawlogs, and making misrepresentations to state officials to obtain sawlogs from state forests.

[43]Spectrum Sports, 506 U.S. at 456.

to competition or clearly exclusionary."[44] As discussed above, Ross-Simmons offered evidence that Weyerhaeuser overpaid for sawlogs while its profits declined. Weyerhaeuser's over-bidding for sawlogs clearly threatened competition because it restricted competitors' access to the limited supply of sawlogs. Thus, Weyerhaeuser's conduct on its own supports a reasonable inference of specific intent to eliminate competition.

[9] The testimony of Weyerhaeuser's employees further showed that Weyerhaeuser intended to control prices and eliminate competition. One of Weyerhaeuser's former senior analysts, Eugene Novak, acknowledged on the stand that Weyerhaeuser had the power — and was aware of its power — to influence prices in the alder sawlog market. Novak also authored a memorandum regarding the costs of sawlogs and lumber in which he stated that the increase in sawlog prices despite Weyerhaeuser's predominant market share made no sense. Novak estimated that, due to the excessive prices Weyerhaeuser paid for sawlogs, it "had given up some $40 to $60 million dollars in the last three years." He testified that his boss, Vicki McInnally, who was a member of the senior management team, told him that "that was the strategy that [Weyerhaeuser] designed." A former sales manager for Weyerhaeuser, Cliff Chulos, also testified that "it was taken as a given by everyone that [Weyerhaeuser] could influence price; that [Weyerhaeuser] had to be a major influence." Thus, the testimony in the record supports the finding that Weyerhaeuser specifically intended to eliminate competition.

[10] Moreover, Weyerhaeuser's business projections about sawlog prices indicated that it planned to lower the prices it paid for sawlogs after acquiring a greater market share as a result of decreased competition. Weyerhaeuser tracked com-

---

[44]*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1309 (9th Cir. 1982); *see Spectrum Sports*, 506 U.S. at 459 (stating that unfair tactics can suffice to prove intent to monopolize).

petitors' profit margins and estimated the potential effects of targeted increases in sawlog costs on the ability of low-margin competitors to survive. Such evidence also supports an inference that Weyerhaeuser sought to foreclose competition rather than simply to increase its own business.[45] Thus, when viewed in its entirety, the evidence sufficiently supports a finding of specific intent to control prices and eliminate competition. We now turn to the question of whether substantial evidence supports the finding that a dangerous probability of Weyerhaeuser's achievement of monopoly power existed.

c. Dangerous probability of achieving monopoly power

Monopoly power is the "power to control prices or exclude competition."[46] In determining whether there is a dangerous probability of monopolization, we consider "the relevant market and the defendant's ability to lessen or destroy competition in that market."[47] To control prices unilaterally, Weyerhaeuser had to have obtained market power.[48] Ross-Simmons could demonstrate that Weyerhaeuser had market power either by presenting direct evidence of the injurious exercise of that power or by presenting circumstantial evidence that: defined the relevant market, demonstrated that the defendant held a dominant share of the market, and showed that significant barriers to entry into and expansion within the market exist.[49] We hold that substantial evidence supports the jury's finding that a dangerous probability of Weyerhaeuser's achievement of monopoly power existed.

---

[45] *See* IIIA AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 805b at 340 n.10 (2d ed. 2002) ("[I]n a perfectly competitive market[,] a firm makes price and output decisions without regard to the likely responses of others.").

[46] *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (internal quotation marks and citation omitted).

[47] *Spectrum Sports*, 506 U.S. at 456. Weyerhaeuser does not dispute that the relevant market consists of the market for alder sawlogs in the Pacific Northwest.

[48] *See Rebel Oil*, 51 F.3d at 1434.

[49] *Id.*

The record contains some direct evidence that could support the jury's finding that a dangerous probability of Weyerhaeuser's achievement of monopoly power existed. The testimony from Weyerhaeuser's employees showed that Weyerhaeuser had the power to influence prices and had used its power to raise the price of sawlogs. This direct evidence of Weyerhaeuser's injurious exercise of market power is substantial enough by itself to support the jury's finding of a dangerous probability of achieving monopoly power. We nonetheless examine the circumstantial evidence as well because that evidence provides additional support for the jury's finding.

### (i)   Market share

Weyerhaeuser does not dispute Ross-Simmons's data that, during the relevant time period, Weyerhaeuser's share of the relevant market was approximately 65%. Weyerhaeuser's business records showed that its share was 64% in 1998, with projected increases. We have held a 44% market share sufficient as a matter of law to support a finding of market power for attempted monopolization.[50] Thus, we conclude that Weyerhaeuser's approximately 65% market share supports a finding of market power.

Market share alone, however, does not raise an inference of a dangerous probability of achieving monopoly power if there are "low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors."[51] We therefore turn to the issue of whether significant barriers to entry and expansion existed.

---

[50]*Id.* at 1438; *see also Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366-67 (9th Cir. 1988) (finding a declining 68% market share sufficient to establish market power for an actual monopolization claim).

[51]*Syufy II*, 903 F.2d at 664 (citations omitted).

(ii)   Barriers to entry and expansion

"Entry barriers are additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants, or factors in the market that deter entry while permitting incumbent firms to earn monopoly returns."[52] Such barriers may include legal license requirements, control of an essential resource, entrenched buyer preferences, and higher capital costs for new entrants.[53] Entry barriers that justify a finding of market power must "be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting."[54] We conclude that the high capital costs new entrants faced and the limited availability of sawlogs were barriers to entry that justified an inference of monopoly power.

At the outset, we address Weyerhaeuser's argument that the entry of four new mills during the alleged predation period demonstrated a lack of barriers to entry. We have held that the entry of new competitors does not necessarily demonstrate a lack of barriers to entry.[55] If new entrants are "insufficient to take *significant* business away from the predator, they are unlikely to represent a challenge to the predator's market power."[56] The evidence did not show that the four new entrants took significant business from Weyerhaeuser or that they had a significant market share. In fact, evidence suggests that Weyerhaeuser's market share actually *increased* even though the four new mills entered the market.[57] Moreover, the

---

[52]*Rebel Oil*, 51 F.3d at 1439 (internal citations and quotation marks omitted).

[53]*Id.*; *Brunswick*, 6 F.3d at 1428.

[54]*Rebel Oil*, 51 F.3d at 1439 (citation omitted).

[55]*Id.* at 1440.

[56]*Id.* (emphasis added).

[57]This increase in Weyerhaeuser's market share was likely due to the fact that although four new mills opened to compete with Weyerhaeuser during the alleged period of predation, thirty-one other competitors went out of business.

evidence indicates that, as soon as the new entrants came into the market, they had to pay the sawlog prices Weyerhaeuser set. Thus, the evidence does not show that the four new entrants could take enough business away from Weyerhaeuser to allow the market to correct itself.[58] As a result, the entry of new competitors did not foreclose the possibility that barriers to entry existed. We now turn to the issue of whether higher capital costs and limited sawlog availability were barriers to entry.

Ross-Simmons offered expert testimony to support the proposition that the higher capital costs associated with entering the market constituted a barrier to entry. The record contains evidence that the advent of expensive new machines and product-grading, which did not exist when Weyerhaeuser entered the market, made market entry less feasible because new entrants had difficulty matching the necessary technology. The need for this new technology raised the cost of entering the market to $20-$25 million. While Weyerhaeuser also had to incur costs for machinery and product-grading, it was able to do so over time without bearing the burden of heavy front-end costs to gain entry into the market. Thus, substantial evidence supports the inference that higher capital costs were a barrier to entry.

With respect to the availability of raw materials, Weyerhaeuser argues that there were sufficient sawlogs available for all competitors if they could afford to buy them. However, Weyerhaeuser purchased approximately 65% of the available sawlogs during the period of alleged predation. The evidence further shows that Weyerhaeuser raised the price of sawlogs and entered into exclusive agreements that restricted competitors' access to sawlogs. By thus controlling or influencing a number of the available sawlog sources, Weyerhaeuser restricted access to the already limited sawlog

---

[58]*See id.* at 1439.

supply.[59] Weyerhaeuser's dominance in the market for saw-logs, its overbidding practices, and its restrictive arrangements together support the inference that the limited supply of sawlogs was a barrier to entry.

[11] The evidence shows that significant barriers to entry existed in the sawlog market in the form of high capital costs and limited raw materials, and that Weyerhaeuser had a dominant share of the market. Moreover, the record contains direct evidence of Weyerhaeuser's injurious exercise of market power. Therefore, we hold that substantial evidence supports the jury's finding that a dangerous probability of Weyerhaeuser's achievement of monopoly power existed.

[12] Because substantial evidence shows that Weyerhaeuser engaged in anticompetitive conduct through predatory overbidding, intended specifically to eliminate competition, and a dangerous probability of Weyerhaeuser's achievement of monopoly power existed, we uphold the jury's verdict against Weyerhaeuser on the attempted monopolization claim. Accordingly, we affirm the court's denial of Weyerhaeuser's motion for judgment as a matter of law.

## B.   REMAINING ISSUES

Two issues remain for our consideration: (1) damages, and (2) attorneys' fees and costs. For the reasons stated below, we uphold both the jury's damages award and the court's grant of fees and costs to Ross-Simmons.

### 1.   Damages

We give substantial deference to a jury's damages award.[60]

---

[59]*See Syufy II*, 903 F.2d at 667 (stating that an incumbent's control over a scarce commodity might give it a "substantial structural advantage").

[60]*Del Monte Dunes*, 95 F.3d at 1435; *see Los Angeles Mem'l*, 791 F.2d at 1360.

In antitrust cases, we accept a degree of uncertainty when evaluating damages awards because of the inherent "difficulty of ascertaining business damages" when "[t]he vagaries of the marketplace usually deny us sure knowledge of what [a] plaintiff's situation would have been in the absence of the defendant's antitrust violation."[61] We will affirm the jury's damages award if it is not based upon "speculation or guess-work."[62] "It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate."[63] We conclude that the jury based its award upon an appropriate estimate of damages.

[13] Ross-Simmons's models for estimating damages properly relied upon the fundamental assumption that Weyerhaeuser maintained artificially high costs in the sawlog market during the damages period. Ross-Simmons's estimates were based either on testimony regarding Weyerhaeuser's annual loss in profits due to higher sawlog costs or on a decade's worth of data regarding Weyerhaeuser's average profit margin prior to the predatory period. The models accounted for changing market conditions by: (1) using data for actual sales and production of finished lumber, which took into account any reduced market demand or decrease in market prices for finished lumber, and (2) assuming that Weyerhaeuser could have controlled sawlog costs to maintain its previous profit margins relative to the price of lumber. The evidence, as discussed above, supports the assumption that Weyerhaeuser had such control. Thus, we conclude that Ross-Simmons's damages models were not speculative, but provided a reasonable basis for computing damages. Accordingly, we uphold the jury's award of damages.

---

[61]*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981); *see Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946); *Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927).

[62]*Bigelow*, 327 U.S. at 264.

[63]*S. Photo*, 273 U.S. at 379.

### 2.  Attorneys' Fees and Costs

[14] We uphold a court's award of attorneys' fees unless it abused its discretion or committed a clear error of law.[64] Because we affirm the jury's verdict of liability for attempted monopolization, Ross-Simmons remains a prevailing party entitled to attorneys' fees and costs. Thus, the district court properly granted attorneys' fees and costs to Ross-Simmons.

## III.   CONCLUSION

We conclude that *Brooke Group* does not apply in this predatory bidding case because benefit to consumers and stimulation of competition are less likely to result here than in predatory pricing cases. A plaintiff bringing a claim under § 2 of the Sherman Act based on predatory overbidding in a relatively inelastic market need not show that the defendant operated at a loss and that a dangerous probability of the defendant's recoupment of those losses existed to succeed on its claim. Substantial evidence supports the jury's finding that Weyerhaeuser was liable for attempted monopolization. Therefore, we affirm the court's denial of Weyerhaeuser's motion for judgment as a matter of law or for a new trial. The jury based its damages award upon a reasonable estimate of damages. Therefore, we affirm the jury's damages award. Finally, because we affirm the jury's verdict, we also affirm the court's award of attorneys' fees and costs to Ross-Simmons.

**AFFIRMED**.

---

[64]*Hasbrouck v. Texaco, Inc.*, 879 F.2d 632, 635 (9th Cir. 1989).