STANDFACTS CREDIT SERVICES, INC., et al., Plaintiffs,

v.

EXPERIAN INFORMATION SOLUTIONS, INC., et al., Defendants.

No. SA CV04–0358 DOC PJW.

United States District Court, C.D. California.

Dec. 7, 2005.

Cyrus Mehri, Mehri & Skalet, PLLC, Washington, DC, Daniel E Gustafson, Gustafson Gluck, Minneapolis, MN, Dennis Stewart, Hulett Harper Stewart, Edward M Gergosian, Gergosian and Gralewski, San Diego, Gary E Mason, The Mason Law Firm, Jonathan W Cuneo, Cuneo Law Group, Washington, DC, Michael J Flannery, Carey & Danis, St Louis, MO, Robert J Gralewski, Jr, Milberg Weiss Bershad Hynes & Lerach, Stephanie L Dieringer, Hulett Harper Stewart, Robert J Gralewski, Jr, Gergosian and Gralewski, San Diego, Michael J Flannery, Carey & Danis, St Louis, MO, for Standfacts Credit Services, Plaintiff.

Eric P Enson, Jones Day, Jason C Murray, Jones Day, Los Angeles, Thomas Demitrack, Jones Day, North Point, Cleveland, OH, Thomas R Malcolm, Jones Day, Los Angeles, Gary E Mason, Cohen Milstein Hausfeld & Toll, Washington, DC, for Defendant Experian Information Solutions, Inc.

Jon L Spargur, Jr, Alston and Bird, Michael P Kenny, Alston & Bird, Peter Kontio, Alston & Bird, Teresa T Bonder, Alston & Bird, Valarie C Williams, Alston and Bird, Atlanta, GA, William A Molinski, Orrick Herrington and Sutcliffe, Eric P Enson, Jones Day, Jason C Murray, Jones Day, Los Angeles, for Defendant Equifax, Inc.

Brian C Frontino, Stroock Stroock & Lavan, Los Angeles, Donald E Bradley, Crowell & Moring, Irvine, James K Gardner, Neal Gerber and Eisenberg, Chicago, IL, Julia B Strickland, Stroock Stroock and Lavan, Los Angeles, Phil C Neal, Neal Gerber and Eisenberg, Chicago, IL, Stephen J Newman, Stroock Stroock and Lavan, Los Angeles, for Defendant Transunion, LLC.

*AMENDED ORDER* GRANTING DEFENDANTS EQUIFAX AND TRANS UNION'S MOTION TO DISMISS NON-RESIDENT PLAINTIFFS' UNFAIR COMPETITION CLAIMS IN COUNT V; DENYING MOTION TO DISMISS COUNT IV; GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS COUNT I AND THE NCRA'S CLAIMS, AND MOTION TO STRIKE PORTIONS OF COUNT V; GRANTING DEFENDANTS MOTION FOR SUMMARY JUDGMENT ON COUNT III

DAVID O. CARTER, District Judge.

Before the Court are motions to dismiss, a motion to strike, and a motion for summary judgment concerning Plaintiffs' Third Amended and Consolidated Complaint for Violations of the Sherman Act, Clayton Act, Robinson–Patman Act, and State Law ("TAC"). Specifically, the following motions are before the Court: (1) Defendants Equifax Inc. ("Equifax") and Trans Union LLC's ("Trans Union") motion to dismiss Count V of the TAC brought by non-resident Plaintiffs under California's Unfair Competition Law ("UCL"); (2) Defendant Experian Information Solutions, Inc.'s ("Experian") motion to dismiss Count IV, a claim under California's Unfair Practices Act; (3) Defendants' motion to dismiss Count I (Sherman Act § 2) and all claims by Plaintiff National Credit Reporting Agency's ("NCRA") and motion to strike paragraph 124 in Count V; and (4) Defendants' motion for summary judgment of Count III, a claim under the Robinson–Patman Act. After considering the moving, opposing, and replying papers, and oral argument by all parties, the Court hereby (1) GRANTS the motion to dismiss the UCL claims in Count V brought by non-resident Plaintiffs against Defendants Equifax and Trans Union, (2) DENIES the motion to dismiss Count IV against Defendant Experian, (3) GRANTS IN PART and DENIES IN PART the motion to dismiss Count I (Sherman Act § 2), all claims by the NCRA and motion to strike, and (4) GRANTS the motion for summary judgment of Count III.

## I. BACKGROUND

Defendants are the three dominant repositories of consumer credit data in the United States. They gather, process, and sell information about consumers in the form of credit reports. Defendants sell consumer credit information at both the wholesale (to resellers) and retail levels (to end users). Due to case consolidation, Plaintiffs consist of two groups: Class Plaintiffs and the Association Plaintiff, the NCRA.[1] Class Plaintiffs are independent

---

**1.** Case number SA CV 04–358 DOC (PJWx) was consolidated with case number SA CV 04–1055 DOC (PJWx), an action brought by the NCRA, on December 13, 2004.

credit reporting agencies ("CRAs") who purchase, process and resell credit reports from Defendants. NCRA is a trade organization, of which Class Plaintiffs are members.

On August 18, 2004, the Court granted Defendants' motion to dismiss the First Amended Complaint ("FAC"), which stated monopolization claims under section 2 of the Sherman Act. Order Granting Defs.' Mot. to Dismiss ("First Dismissal Order"). On May 12, 2005, the Court denied Defendants' motion for judgment on the pleadings and dismissed in part the Second Amended Complaint ("SAC"). Order Dismissing in Part Second Am. Compl. and Denying Mot. for J. on the Pleadings ("Second Dismissal Order"). The Court dismissed with prejudice the claims under section 2 of the Sherman Act, and dismissed without prejudice the claims under section 43(a) of the Lanham Act, the Illinois Consumer Fraud and Deceptive Practices Act, the Georgia Uniform Deceptive Trade Practices Act, and unjust enrichment. The Court denied Defendants' motion to dismiss with respect to claims under section 1 of the Sherman Act, the Robinson–Patman Act, and the California Unfair Competition Law.

On June 30, 2005, Class Plaintiffs and the NCRA filed the Third Amended and Consolidated Complaint for Violations of the Sherman Act, Clayton Act, Robinson–Patman Act, and State Law ("TAC"). Count I of the TAC alleges attempted monopolization and conspiracy to monopolize in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. The Court has previously held that Count II adequately pleads conspiracy or combination in restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Second Dismissal Order 15. Count III alleges discriminatory pricing in violation of the Robinson–Patman Act, 15 U.S.C. § 13(a).[2] Count IV alleges that Experian has extended special rebates to its affiliates in violation of section 17045 of the California Unfair Practices Act ("UPA"). Count V alleges deceptive and unlawful business practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. § 17200 et seq. ("UCL").

## A. Industry History

The credit reporting market originally consisted of a large number of CRAs, which were involved in collecting and reporting consumer credit data. These CRAs formed networks that allowed them to gain access to credit data from geographically remote regions. Each network controlled access to a certain set of credit report data and sold it to non-members. Thus, the inter-bureau markets for consumer credit reports arose. In 1933, the U.S. Department of Justice sued the leading CRA trade association for antitrust violations in the inter-bureau market. That suit led to entry of a consent decree targeted at curbing the anti-competitive effect of exclusive CRA networks. The consent decree remained in effect, and controlled the behavior of the bulk of CRAs, until 1988.

At the time the consent decree was lifted, there were five major CRA networks with central data repositories. Four of those networks had been subject to the consent decree. The five networks soon consolidated into the three Defendants and their respective independent CRA affiliates. In the 1990s, the Defendants began acquiring many of the independent CRA

---

**2.** Paragraph 114 of the TAC cites to section 2(f) of the Robinson–Patman Act. This citation is a typographical error, and Plaintiffs have made clear that they are alleging a claim under section 2(a). Statement of Genuine Issues in Opp'n to Defs.' Mot. for Summ. J. ¶ 1.

affiliates that were part of their networks. Plaintiffs allege that the number of affiliated CRAs has dropped from a peak of 1,000 to approximately 25 today due to Defendants' anti-competitive actions.

### B. Tri–Merged Reports

Each defendant maintains their own database of credit information, and sells that data in the form of credit reports on the inter-bureau (wholesale) and retail markets. Plaintiffs allege that the collection and collation of the data is an automated process that results in a large number of errors and discrepancies. Indeed, demand from mortgage credit loan underwriters, lenders, and brokers for more accurate credit information has created a market for value-added credit reports. These mortgage credit reports are prepared by CRAs, in part from "raw" credit reports purchased from Defendants.

The demand for mortgage credit reports is driven in large part by a number of government sponsored entities ("GSEs")[3] that participate in the secondary market for residential loans. Beginning in the early 1980s, the GSEs implemented an underwriting requirement that mortgage credit reports be based on credit reports from at least two data repositories. In 1995, the GSEs moved to a system of automated underwriting and began to require that mortgage credit reports be based on credit reports from all three of the Defendants. ("tri-merged reports"). Thus, all residential mortgage transactions undertaken by primary lenders who intend to seek access to the secondary market must use tri-merged reports. Plaintiffs claim that residential mortgage loans make up the largest portion of Plaintiffs' business. The tri-merge requirement forces Plaintiffs to purchase a credit report from each Defendant at the wholesale level, and then merge those reports to generate a mortgage credit report ("MCR") for their retail customers. Plaintiffs are not the only MCR vendors; some primary lenders have in-house MCR generating capabilities, and Defendants have affiliated and wholly-owned subsidiaries that operate in the retail MCR arena. An additional service provided by MCR vendors is "re-scoring," a process whereby notice of errors or omissions is sent to the appropriate repository by the vendor. For a fee, the repository then corrects the error and reissues a credit score report to the vendor.

## II. MOTION TO DISMISS

### A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint can be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. The Court must construe the complaint liberally, and dismissal should not be granted unless "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *see Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988) (stating that a complaint should be dismissed only when it lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory).

The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *West-*

---

**3.** These GSEs include the Federal National Mortgage. Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), the Government National Mortgage Association ("Ginnie Mae"), and the United States Department of Housing and Urban Development ("HUD").

*lands Water Dist. v. Firebaugh Canal,* 10 F.3d 667, 670 (9th Cir.1993); *Balistreri,* 901 F.2d at 699; *NL Indus., Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986).

Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies of the complaint could not possibly be cured by amendment. *Jackson v. Carey,* 353 F.3d 750, 758 (9th Cir.2003); *James v. Giles,* 221 F.3d 1074, 1077 (9th Cir.2000); *Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir.1996).

## B. Discussion

### 1. Claims of Non–Resident Plaintiffs Against Non–Resident Defendants

Defendants Equifax and Trans Union have moved to dismiss the California UCL claim brought by Plaintiffs who are not residents of California. Sixteen of the Class Plaintiffs named in the TAC, like Equifax and Trans Union, are not alleged to be residents of California ("Non–Resident Plaintiffs").[4]

The leading California case on application of the UCL to non-resident parties is *Norwest Mortgage, Inc. v. Superior Court.,* 72 Cal.App.4th 214, 85 Cal.Rptr.2d 18 (1999). *Norwest* was an appeal from the certification of a nationwide class in a matter involving costs of insurance. *Id.* at 217, 85 Cal.Rptr.2d 18. Norwest was a California corporation, with its principal place of business in Iowa. *Id.* It was engaged in lending to homeowners in all fifty states. *Id.* On appeal, the *Norwest* court overturned the trial court class certification. In doing so, it identified at least

three categories of class members: (1) California residents; (2) non-California residents alleging conduct in California; and (3) non-California residents alleging conduct outside of California. *Id.* at 222, 85 Cal.Rptr.2d 18.

The Court of Appeal in *Norwest* noted that while it had personal jurisdiction over Norwest by virtue of its incorporation in California, there were due process problems with the claims made by the third category of plaintiffs. *Id.* at 225–26, 85 Cal.Rptr.2d 18 (discussing *Phillips Petroleum v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)). Specifically, there must be "significant contact or a significant aggregation of contracts to the claims asserted by each member of the plaintiff class to ensure that the application of the forum law to each plaintiff's claim is not arbitrary or unfair." *Id.* at 226, 85 Cal.Rptr.2d 18. The court noted that the bulk of the injury-causing actions were taken by Norwest in Iowa or Ohio. *Id.* Then the court held that the UCL did not apply to such actions when they injured non-residents. *Id.* The *Norwest* court also noted that on remand, the trial court would have to consider choice of law issues regarding the second category of plaintiffs as part of the class certification inquiry. *Id.* at 229, 85 Cal.Rptr.2d 18.

█ The TAC alleges that the conspiracy that forms the basis of the Sherman Act claims is a violation of the UCL, and that "many of the acts taken in furtherance of the conspiracy, in particular those taken by Experian, took place in California." TAC ¶ 127. Under California law, the ele-

---

4. Those plaintiffs are: (1) Lenders' Credit Services, Inc.; (2) Advantage Credit, Inc.; (3) Alliance Credit Services, Inc.; (4) Access Credit Reports, LLC; (5) Advanced Credit Solutions, Inc.; (6) Calmaya Credit; (7) Landlord 2 Landlord LLC; (8) Mortgage Credit Reports, Inc.; (9) Mortgage Credit Solutions, Inc.; (10) Pyramid Mortgage Services; (11) The Two Hundred Percent Company d.b.a. Applicant Data Source; (12) Credit Bureau Services, Inc.; (13) Credit Lenders Service Agency, Inc.; (14) Karen Slezak f.k.a. Credit Resources, Inc.; (15) Premium Mortgage Service, Inc. d.b.a. Premium Credit Bureau; and (16) Universal Credit Services, Inc.

ments of civil conspiracy are "the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 511, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994). The Non–Resident Plaintiffs argue that their UCL claim against Equifax and Trans Union can piggyback on the allegations about Experian's conduct in California under a theory of co-conspirator liability.

 There is little question that co-conspirators can be found liable for acts in furtherance of a conspiracy. *See, e.g., Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 785, 157 Cal.Rptr. 392, 598 P.2d 45 (1979). However, co-conspirator liability "presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." *Applied Equip. Corp.,* 7 Cal.4th at 511, 28 Cal.Rptr.2d 475, 869 P.2d 454; *accord Doctors' Co. v.Super. Ct.,* 49 Cal.3d 39, 44, 260 Cal.Rptr. 183, 775 P.2d 508 (1989) (holding that civil conspiracy may not arise "if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing"). In this case, Equifax and Trans Union must owe a duty to the Non–Resident Plaintiffs under California law for co-conspirator liability to attach. The TAC does not specifically allege any wrongful acts by Equifax and Trans Union that occurred in California; rather, it alleges co-conspirator liability based acts committed by *Experian* in California in violation of the UCL. TAC ¶ 127. Since the UCL does not apply to actions occurring outside of California that injure non-residents, *Norwest Mortgage,* 72 Cal. App.4th at 226, 85 Cal.Rptr.2d 18, the UCL cannot provide the basis for a duty owed by non-resident Defendants Equifax and Trans Union to the Non–Resident

Plaintiffs under the UCL. Therefore, the Non–Resident Plaintiffs cannot state a claim based on co-conspirator liability against Equifax and Trans Union.

Plaintiffs cite two cases from California in support of the stance that a UCL conspiracy has been adequately pleaded as to the Non–Resident Plaintiffs and Defendants. However, while both of those cases involve UCL conspiracy allegations, they also involve California plaintiffs and are thus of little probative value. *See Diaz v. Allstate Ins. Group,* 185 F.R.D. 581 (C.D.Cal.1998); *People v. Bestline Prods., Inc.,* 61 Cal.App.3d 879, 132 Cal.Rptr. 767 (1976). Mindful of the presumption that the California legislature does not intend for its statutes to have "force or operation beyond the boundaries of the state," *Norwest Mortgage,* 72 Cal.App.4th at 222, 85 Cal.Rptr.2d 18, the Court finds that Equifax and Trans Union cannot be liable to the Non–Resident Plaintiffs under a claim of UCL conspiracy. Therefore, the TAC fails to state a claim by the Non–Resident Plaintiffs against non-resident Defendants Equifax and Trans Union. The Court GRANTS the motion to dismiss and DISMISSES WITH PREJUDICE the UCL claims brought by the Non–Resident Plaintiffs against Equifax and Trans Union.

### 2. Section 17045 of the California Unfair Practices Act

Section 17045 of the UPA provides:

The secret payment or allowance of rebates, refunds, commissions or other unearned discounts, whether in the form of money or otherwise or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful.

Cal. Bus. & Prof.Code § 17045. The stated legislative purpose of the UPA is to "safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." Cal. Bus. & Prof. Code § 17001. "Section 17045, like the other provisions of the Act, must be 'liberally construed' to serve its purposes." *Diesel Elec. Sales & Serv. v. Marco Marine San Diego, Inc.*, 16 Cal.App.4th 202, 212, 20 Cal.Rptr.2d 62 (1993) (quoting Cal. Bus. & Prof.Code § 17002); *see also ABC Int'l Traders, Inc. v. Matsushita Elec. Corp.*, 14 Cal.4th 1247, 1256, 61 Cal. Rptr.2d 112, 931 P.2d 290 (1997) (quoting same statutory language and construing section 17045 to extend to secondary line price discrimination to "more fully serve the UPA's purposes").

■ Plaintiffs allege that Defendant Experian "secretly extended to its affiliate purchasers and other favored purchasers of its credit reports special privileges and pricing and unearned discounts which it did not extend on like terms and conditions to the Class Plaintiffs and members of the class in violation of California Business & Professions Code § 17045." TAC ¶ 118. Experian argues that Plaintiffs have failed to plead facts sufficient to support a claim of "secrecy" with respect to these rebates extended by Experian to its affiliates. Experian submits that a plaintiff in alleging a violation of section 17045 "must state with reasonable particularity the facts supporting the statutory elements of the violation." *Khoury v. Maly's of Cal., Inc.*, 14 Cal.App.4th 612, 619, 17 Cal.Rptr.2d 708 (1993). It cites to a district court decision for the proposition that this heightened pleading standard, rather than the notice pleading standard of Federal Rule of Civil Procedure 8, should apply in federal court. *Nicolosi Distrib. Co. v. Finishmaster, Inc.*,

C 99–0927 MJJ, 2000 U.S. Dist. LEXIS 505, at *5, 2000 WL 41222 (N.D.Cal. Jan. 13, 2000).

■ The Court is not convinced that the heightened pleading standard articulated in *Khoury* applies to this case. The court of appeal in *Khoury* stated the pleading standard for claims under both section 17000 et seq. and 17200 et seq., and did not specifically address the secret rebate provision of section 17045. *Khoury*, 14 Cal. App.4th at 619, 17 Cal.Rptr.2d 708. In *G.H.I.I. v. MTS, Inc.*, 147 Cal.App.3d 256, 195 Cal.Rptr. 211 (1983), the California Court of Appeal held that "given the nature of [a section 17045 cause of action], it is difficult to conceive how appellants could have pleaded the case with greater specificity." 147 Cal.App.3d 256 at 272, 195 Cal.Rptr. 211. The Court agrees that a plaintiff cannot plead many specifics when alleging "secret" conduct under section 17045. If a plaintiff knows the nature and terms of a rebate, then the rebate is not "secret" and thus not in violation of the statute. If the heightened pleading standard articulated in *Khoury* applied to claims under section 17045, no claim would ever survive a motion to dismiss. Such a standard would also conflict with the legislature's intent that section 17045 be "liberally construed." *Diesel Elec. Sales & Serv.*, 16 Cal.App.4th at 212, 20 Cal. Rptr.2d 62. Here, Plaintiffs have pleaded that Experian has "secretly extended to its affiliate purchases … special privileges and pricing and unearned discounts which it did not extend on like terms and conditions to the Class Plaintiffs;" such a pleading is sufficient to put Experian on notice of the nature of the claim. TAC ¶ 118. Therefore, the Court finds that Plaintiffs have adequately pleaded their claim under section 17045.

Experian further contends that Plaintiffs' section 17045 claim is invalid because

statements in the TAC contradict Plaintiffs' assertion that Experian's rebates to its affiliates were secret. Experian cites three allegations in the TAC, which it argues demonstrate the deficiency of Plaintiffs' section 17045 claim. First, it cites the allegation that "[e]xorbitant pricing of inter-bureau reports to independent MCRAs by affiliates protecting their own MCR business emerged almost as soon as the 1933 Consent Decree was lifted in 1988." TAC ¶ 64. Next, it cites the allegation that the "ACB, of which most resellers were members, was unresponsive to the complaints of the independent resellers over the conduct of the affiliates." *Id.* ¶ 65. Experian argues that these statements demonstrate that any rebates Experian was offering to its affiliates were not secret, but rather known by the Plaintiffs since 1988. However, these allegations do not explicitly state that the rebate was known by Plaintiffs or other non-affiliated MCRAs, nor do they disclose any information about the amount or other specifics about the rebate. When accepting as true all factual allegations in the complaint and drawing all reasonable inferences from the allegations, *Westlands Water Dist.,* 10 F.3d at 670, the Court finds that these allegations do not invalidate Plaintiffs' section 17045 claim.

■ Experian also cites paragraph 115 of the TAC, in which Plaintiffs allege that Experian charges Plaintiffs prices that are "as high as 1,500% more than is charged to affiliates and wholly-owned MCRAs." TAC ¶ 115. Experian argues that this allegation directly contradicts Plaintiffs' allegation that any rebates were secret. However, in light of the liberal pleading policy of Rule 8, "a pleading should not be construed as an admission against another alternative or inconsistent pleading in the

same case." *Molsbergen v. United States,* 757 F.2d 1016, 1019 (9th Cir.1985) (holding that the district court should have analyzed two counts of the complaint independent of each other). Plaintiffs' allegation regarding the price differential is made in paragraph 115, Count III of the TAC, claiming a violation of the Robinson–Patman Act; Plaintiffs' UPA claim is asserted in paragraph 118, Count IV of the TAC. The Court must therefore evaluate the factual allegations made in the two claims independent of each other. Thus, paragraph 115 in Count III is not an inconsistent admission that invalidates Plaintiffs' section 17045 claim in Count IV.

Therefore, the Court finds that Plaintiffs have adequately pleaded a claim under section 17045 of the UPA. The motion to dismiss is DENIED.

### 3. Section 2 of the Sherman Act

Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade commerce among the several States... shall be deemed guilty of a felony...." 15 U.S.C. § 2. Private actions for violations of the Sherman Act are authorized by section 4 of the Clayton Act. 15 U.S.C. § 15. Defendants have moved to dismiss Count I of Plaintiffs' TAC, which alleges that each Defendant has violated section 2 of the Sherman Act by (1) attempting to monopolize and (2) conspiring to monopolize a wholesale market for inter-bureau credit reports and retail markets for raw consumer credit reports and value added mortgage credit reports. TAC ¶¶ 91–95.[5]

---

**5.** The Court has described these wholesale and retail markets in both the First Dismissal Order and the Second Dismissal Order.

### i. Attempted Monopolization

■ In a claim of attempted monopolization, a plaintiff must allege the following elements: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993). In the First Dismissal Order, the Court dismissed Plaintiffs' attempted monopolization claim in the FAC without prejudice. The Court held that "because Plaintiffs cannot establish a dangerous probability that any single Defendant will achieve monopoly power in the retail market, Plaintiffs fail to state a claim for attempted monopolization." First Dismissal Order 5. In the SAC, Plaintiffs did not allege attempted monopolization; rather, their Sherman Act section 2 claim alleged monopolization only. The Court dismissed this monopolization claim with prejudice. Second Dismissal Order 15. In the TAC, Plaintiffs have re-alleged a claim of attempted monopolization, which they contend is now sustainable in light of the recent Ninth Circuit decision in *Confederated Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.,* 411 F.3d 1030 (9th Cir. 2005).

■ Plaintiffs assert that their attempted monopolization claim is sufficiently pleaded in light of the Ninth Circuit's decision in *Confederated Tribes,* which held that in determining whether a "dangerous probability" of achieving monopoly power exists, a court must consider "the relevant market and the defendant's ability to lessen or destroy competition in the market." 411 F.3d at 1043 (quoting *Spectrum Sports,* 506 U.S. at 456, 113 S.Ct. 884). *Confederated Tribes* addresses attempted monopolization of a single market based on predatory buy-side overbidding, *id.* at 1030, and does not address attempted monopolization in a two-market (wholesale and retail) context, which is alleged in this case. Plaintiffs allege that Defendants leverage their monopoly power in the wholesale inter-bureau market to achieve monopoly power in the retail markets for raw consumer credit reports and value added mortgage credit reports. TAC ¶ 95. The two-market context is addressed by the Ninth Circuit in *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536 (9th Cir.1991), a case that is neither cited nor discussed in *Confederated Tribes.* Contrary to Plaintiffs' assertion, *Confederated Tribes* does not change the standard for determining whether a "dangerous probability" of achieving monopoly power exists. Indeed, the Ninth Circuit quotes the Supreme Court's decision in *Spectrum Sports,* the very authority cited by this Court in the First Dismissal Order for the elements of attempted monopolization. *Confederated Tribes,* 411 F.3d at 1043. Thus, the Court finds that *Confederated Tribes* did not overturn *Alaska Airlines,* and did not change the "dangerous probability" standard applied by the Court in its First Dismissal Order.

Plaintiffs' concession in both the FAC and TAC that competition will remain in the retail market, even if all the Plaintiffs are excluded from the market, is a fatal flaw in their attempted monopolization claim. In the First Dismissal Order, the Court held that "[b]ecause each Defendant is a separate entity selling tri-merged reports at the retail level ... Plaintiffs' [FAC] establishes that competition will remain at the retail level even if all Plaintiffs are excluded from the market, as end-users may choose to purchase tri-merged reports from any of the three Defendants." *Id.* at 4. In the TAC, Plaintiffs again concede that competition will remain at the retail level. Paragraph 88 alleges that "because of the uniqueness of the market and the necessity of obtaining information

in the databases of each Defendant," Defendants' conduct will lead to a "market monopolized by only one of the surviving Defendants or a market where all of the anticompetitive effects of a *de facto* consolidation of the three Defendant companies will occur." TAC ¶ 88. Plaintiffs' acknowledgment of the "uniqueness of the market and the necessity of obtaining information in the databases of each Defendant" belies its subsequent assertions that the market will be monopolized by only one Defendant or that a "*de facto* consolidation" will occur.[6] Plaintiffs further concede that the "uniqueness of the market" is based upon the GSEs' "tri-merge requirement" for mortgage credit reports. *Id.* ¶ 94. Due to this requirement, "each Defendant needs reports from the others in order to compete in the market" and it is "impossible for a single Defendant to gain a monopoly in the retail market, even if all of the Plaintiffs were to be excluded from the market." Second Dismissal Order 7. Thus, Plaintiffs have not amended their attempted monopolization claims sufficiently to plead a "dangerous probability" that a single Defendant will achieve monopoly power in the retail market.

Therefore, since *Confederated Tribes* did not change the pleading requirements for stating a "dangerous probability" of achieving monopoly power, and because Plaintiffs have not alleged in the TAC that any single Defendant will achieve monopoly power in the retail market, the Court finds that Plaintiffs have failed to state a claim for attempted monopolization under section 2 of the Sherman Act.

#### ii. Conspiracy to Monopolize

██ In addition to their attempted monopolization claim, Plaintiffs have also alleged conspiracy to monopolize, which is prohibited by section 2 of the Sherman Act. 15 U.S.C. § 2. In a claim of conspiracy to monopolize, a plaintiff must allege the following elements: "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assoc., Inc. v. Mont. Power Co.,* 328 F.3d 1145, 1158 (9th Cir.2003). Defendants argue that Plaintiffs' conspiracy to monopolize claim should be dismissed because it fails to allege a specific intent to monopolize.

██ The Court agrees with Defendants that Plaintiffs' TAC fails to allege a specific intent by Defendants to empower one of them with monopoly power. Indeed, Plaintiffs concede the "uniqueness of the market and the necessity of obtaining information in the databases of each Defendant." TAC ¶ 88. Since section 2 prohibits only monopolization by a single entity, as opposed to shared monopolization, *see Rebel Oil,* 51 F.3d at 1443, an allegation of conspiracy to create a shared monopoly does not plead a claim of conspiracy under section 2. *See Sun Dun, Inc. of Wash. v. Coca-Cola Co.,* 740 F.Supp. 381, 392 (D.Md.1990) (dismissing a claim for conspiracy to monopolize where "two or more competitors conspire to create a market environment in which competition and market entry is improperly restricted, but in which market power continues to be

---

**6.** Plaintiffs' allegation of a "*de facto* consolidation" appears to be inconsistent with a claim under section 2 of the Sherman Act, which concerns "unilateral activity," and holds liable "every person" who shall attempt to monopolize. *Alaska Airlines,* 948 F.2d at

541 (quoting 15 U.S.C. § 2); *accord Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1443 (9th Cir.1995) (holding that "[t]o pose a threat to monopolization, one firm *alone* must have the power to control market output and exclude competition").

shared among these otherwise unrelated entities").

Moreover, Plaintiffs' conspiracy claim, which has not been previously pleaded, appears to be a reformulation of their Sherman Act section 1 claim of conspiracy to restrain trade, which has already survived a motion to dismiss and is not challenged by Defendants. Second Dismissal Order 8. Plaintiffs allege that Defendants have aimed to "severely restrict competition in" the retail markets and create an "unlawful barrier to entry to the credit reporting market ...." TAC ¶¶ 96, 99. However, successfully asserting a section 1 violation does not necessarily constitute an adequate section 2 conspiracy to monopolize claim, since section 1 does not require a specific intent to monopolize. *Compare The Jeanery v. James Jeans, Inc.*, 849 F.2d 1148, 1152 (9th Cir.1988) (stating elements for a section 1 claim), *with Paladin*, 328 F.3d at 1158 (stating elements for a section 2 conspiracy to monopolize claim); *see FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1030 (2d Cir. 1976) (affirming dismissal of section 2 claim that defendant was conspiring with its dealers to maintain a shared monopoly, and holding that such a claim "amounts to nothing more" than a section 1 claim "under another name"). Therefore, since Plaintiffs have failed to allege the required element of "specific intent to monopolize," the TAC has failed to state a claim for conspiracy to monopolize under section 2 of the Sherman Act.

Although Plaintiffs specifically allege conspiracy under section 2 for the first time in the TAC, leave to amend this claim would be futile since Plaintiffs concede that no single Defendant will monopolize the retail markets due to the tri-merge requirement. Thus, Plaintiffs cannot, as a matter of law, plead that Defendants have conspired to anoint one among them the monopolist of the retail markets. Therefore, the Court DISMISSES the conspiracy to monopolize claim, as well as the attempted monopolization claim, WITH PREJUDICE.

#### 4. Claims of the NCRA Under California's UCL

Defendants move to dismiss claims under the UCL made by the NCRA on behalf of its members.[7] Defendants argue that the NCRA fails to satisfy the standing requirements of the UCL, as enacted by Proposition 64 on November 3, 2004. As amended by Proposition 64, section 17203 of the UCL requires that "[a]ny person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of section 17204 and complies with section 382 of the Code of Civil Procedure ...." Cal. Bus. & Prof.Code § 17203. The NCRA first filed its claims against Defendants on March 25, 2004. Currently under consideration by the California Supreme Court is the issue of whether Proposition 64's standing requirements apply to cases that were pending when Proposition 64 was enacted. *See, e.g., Branick v. Downey Sav. & Loan*, 28 Cal.Rptr.3d 2, 110 P.3d 1217 (2005) (granting petition for review).

Defendants do not challenge the NCRA's Article III standing to bring suit on behalf of its members. *See Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975) (holding that

---

**7.** Defendants also move to dismiss any claim by the NCRA brought in an individual capacity under the UCL. The Court does not read the TAC to assert a UCL claim by the NCRA in its individual capacity. *See* TAC ¶ 24 (naming the NCRA as "Association Plaintiff" and stating that the NCRA has brought this action on behalf of its members). In their opposition to this motion to dismiss, Plaintiffs have confirmed that the NCRA has brought its UCL claims on behalf of its members. Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss Count I & the NCRA's Claims & Mot. to Strike Portions of Count V of the TAC 14:22–15:5.

"[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members"). Defendants' motion to dismiss the NCRA's UCL claims depends solely on the effect of Proposition 64. Since the California Supreme Court is currently considering whether Proposition 64's amendments apply to pending cases, this Court will not rule on Defendants' motion to dismiss the NCRA's UCL claims at this time. Instead, this motion is DE-NIED and Defendants are granted leave to refile the motion in the event that the California Supreme Court determines that Proposition 64 has retroactive effect.

## III. MOTION TO STRIKE

Defendant Experian seeks to strike paragraph 124 from the TAC, in which Plaintiffs allege that Experian's conduct "constitutes unfair business practices because the conduct alleged in this Complaint either violates the antitrust laws or threatens an incipient violation of the antitrust laws." TAC ¶ 124.[8] Experian moves to strike this paragraph to the extent it is based on a claim of monopolization in violation of section 2 of the Sherman Act, which the Court has dismissed with prejudice. Second Dismissal Order 15.

### A. Legal Standard

■ Federal Rule of Civil Procedure 12(f) provides that a court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R.Civ.P. 12(f). Motions to strike are disfavored and "are generally not granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *LeDuc v. Ky. Cent. Life Ins. Co.,* 814 F.Supp. 820, 830 (N.D.Cal.1992). The Ninth Circuit has

defined "immaterial" matter as "that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1527 (9th Cir.1993) (internal quotation marks and citation omitted), *rev'd on other grounds,* 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

### B. Discussion

"When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law ...." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 187, 83 Cal. Rptr.2d 548, 973 P.2d 527 (1999). In this sense, the UCL is a "borrowing law," which depends on violations of other laws to take effect. The Court has dismissed with prejudice Plaintiffs' claims under section 2, so that section cannot serve as a predicate violation for UCL liability. Therefore, Defendants' motion to strike is moot. However, section 1 of the Sherman Act, which the Court has found adequately pleaded, does constitute a predicate antitrust violation. Second Dismissal Order 12. The Court does not strike paragraph 124 of the TAC, but Plaintiffs may not use it as the basis for discovery concerning alleged conduct in violation of section 2 of the Sherman Act. Defendants' motion is DENIED AS MOOT.

## IV. SUMMARY JUDGMENT

Defendants have moved for summary judgment on Count III of the TAC, which states a claim under section 2(a) of the Robinson–Patman Act for price discrimination. Defendants argue that credit reports are not tangible goods, and thus

---

8. Experian also moved to strike paragraphs 125 and 126 from the TAC. At oral argument, Plaintiffs withdrew paragraphs 125 and 126 from the TAC.

Plaintiffs' Robinson–Patman claim fails as a matter of law.

## A. Legal Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1161 (9th Cir.1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence of a genuine issue of material fact from the non-moving party. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990).

Once the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e); *see also Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510. Furthermore, a party cannot create a genuine issue of material fact simply by making assertions in its legal papers. There must be specific, admissible evidence identifying the basis for the dispute. *S.A. Empresa De Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.,* 690 F.2d 1235, 1238 (9th Cir.1982). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

■ Despite the factual complexity presented in many antitrust cases, summary judgment is nevertheless appropriate in complex antitrust litigation where motive and intent are not important. *Int'l Healthcare Mgmt. v. Haw. Coal. for Health,* 332 F.3d 600, 604 (9th Cir.2003). Summary judgment is appropriate even when discovery is not complete, unless the non-moving parties can establish "(1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery; (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion." *California ex rel. Cal. Dep't of Toxic Substances Control v. Campbell,* 138 F.3d 772, 779 (9th Cir.1998).

## B. Discussion

■ Under section 2(a) of the Robinson–Patman Act, "[i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality." 15 U.S.C. § 13(a). A sale of commodities is a "sale of 'goods, wares, or merchandise' and is not merely a contract for services." *May Dep't Store v. Graphic Process Co.,* 637 F.2d 1211, 1214 (9th Cir.1980) (quoting *Rangen, Inc. v. Sterling Nelson & Sons, Inc.,* 351 F.2d 851

(9th Cir.1965)). In *May*, the Ninth Circuit found that there were "no congressional discussions on the distinction between goods and services," and that "[l]egislative history reveals only that Congress intended the Act to apply to tangible goods and not services." *Id.* (quoting 79 Cong. Rec. 9079, June 11, 1935).

When a transaction involves both goods and services, the *May* court adopted the "dominant nature" test to determine how to characterize the transaction for the purposes of the Robinson–Patman Act. *Id.* at 1215. Under this test, a court looks to whether a transaction is primarily for tangible products or for services. *Id.* Thus, the Court must engage in a two-step analysis: (1) determine whether a credit report is a tangible good; and (2) if a credit report transaction involves some service aspect, determine whether the "dominant nature" of the transaction is for a tangible product or for a service.

### 1. Tangible Goods

The threshold question here is whether credit reports represent a tangible good at all. Two courts have considered the nature of credit reports under the Robinson–Patman Act. *See Credit Chequers Info. Servs., Inc. v. CBA, Inc.*, No. 98 CIV 3868, 1999 WL 253600 (S.D.N.Y. Apr.29, 1999), *aff'd*, 205 F.3d 1322 (2d Cir.2000) (unpublished); *Nat'l Info. Servs., Inc. v. TRW, Inc.*, No. 01–C–7456, 1992 WL 715632 (D.Or. Sept. 9, 1992), *aff'd*, 52 F.3d 334 (9th Cir.1995) (unpublished). In *National Information Services*, the district court granted Defendants' motion for summary judgment, finding that credit reports are not commodities under the Robinson–Patman Act. 1992 WL 715632, at *12. The court did not engage in a lengthy analysis of the nature of credit reports, but instead relied upon the reasoning in *Tri–State Broadcasting* in holding that, like the news reports transmitted by teletype, "a printed credit report is just the tangible product of a customer's right to a credit bureau's credit information." *Id.* In *Credit Chequers Information Services*, the district court adopted without discussion the reasoning in *Credit Chequers Information Services*, 1999 WL 253600 at *12. On appeal, the Ninth Circuit and Second Circuit affirmed in unpublished table opinions the decisions of the district courts. *Credit Chequers Info Servs.*, 205 F.3d at 1322; *Nat'l Info. Servs.*, 52 F.3d at 334.

The credit reports that are the subject of this suit are transmitted electronically from the repositories to their clients. Thus, there is generally no paper copy of the credit report. Defendants view credit reports as intangibles because they are transmitted electronically. *Cf. Freeman v. Chicago Title & Trust Co.*, 505 F.2d 527, 531 (7th Cir.1974) ("The transfer of any intangible can rarely be accomplished without the 'incidental involvement' of documents or other tangibles."). Plaintiffs argue that the requirement of tangibility be read more expansively. The treatment of electronic data under the Robinson–Patman Act is unclear. However, the parties cite two cases that are instructive in making the tangibility determination.

In *Kirkwood v. Union Electric Co.*, 671 F.2d 1173 (8th Cir.1982), the court dealt with a claim that electric power could be deemed a commodity. "Electric power can be felt, if not touched. It is produced, sold, stored in small quantities, transmitted, and distributed in discrete quantities. We hold that electricity is a commodity for purposes of the Robinson–Patman Act. The antitrust laws should not be given a restrictive interpretation." *Id.* at 1181–82 (citing *City of Gainesville v. Fla. Power & Light Co.*, 488 F.Supp. 1258, 1279–83 (S.D.Fla.1980)). However, in *Metro Communications Co. v. Ameritech Mobile Communications, Inc.*, 984 F.2d 739 (6th

Cir.1993), the court analyzed cellular telephone service and found that it did not involve the sale of a tangible good. Citing *Kirkwood*, the circuit court differentiated cellular telephone service from electricity: "It cannot be produced, felt, or stored, even in small quantities. The plaintiffs do not buy a quantity of it, store it, and resell it to their customers. They simply provide customers with access to the service." *Id.* at 745.

Defendants collect, store, and eventually deliver credit data in the form of credit reports. The data involved constitutes a series of electronic signals that are stored on various electronic storage media. *See* Decl. of David A. Browne ¶ 6; Decl. of Margaret Fortson Leslie ¶ 6; Decl. of Patricia Malloy ¶ 3. While not necessarily visible to the human eye in the form in which it is stored, data undeniably occupies space on electronic storage media that is as tangible as a lump of coal. *See, e.g., MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518–19 (9th Cir.1993) (discussing how duplicates of copyrighted material on electronic storage media satisfy requirements of copying under copyright laws). The data is warehoused by Defendants and delivered on demand to Plaintiffs and others. Therefore, there is at least some tangible aspect to credit reports, and thus the transactions must be analyzed under the dominant nature test.

### 2. Dominant Nature

In adopting the "dominant nature" test for claims under the Robinson–Patman Act, the Ninth Circuit in *May* acknowledged "the difficulty in applying an abstract standard." *May Dep't Store*, 637 F.2d at 1215. In an attempt to provide additional guidance on the matter, the Circuit noted a number of decisions from other courts which it deemed fairly clear-cut, and other situations which "present a much closer question." *Id.* at 1215–16. First among the cases cited by *May* as

clear-cut is *Freeman v. Chicago Title & Trust Co.*, 505 F.2d 527 (7th Cir.1974). In *Freeman*, the Seventh Circuit examined the characteristics of title reports, and found them to constitute services for the purposes of the Robinson–Patman Act. *Id.* at 531. In doing so, the Seventh Circuit noted that while the purchaser of title insurance received a "tangible, physical document," the portion of the transaction that predominated was "the search of records which might reveal a defect in the title and the rendering of an opinion based upon this search; the reports, like legal memoranda, are merely the embodiment of that service." *Id.* The court went on to note that "[c]learly, it is the performance of this service and not the delivery of a physical document which constitutes the dominant nature of the transaction." *Id.*

The second example cited in *May is Tri–State Broadcasting Co. v. UPI*, 369 F.2d 268 (5th Cir.1966). The Fifth Circuit examined whether news reports that were sent by UPI via printer constituted a commodity. The *Tri–State Broadcasting* court found that "[t]he news items in their printed form at best represent tangible incidents of appellant's contractual right to utilize UPI's services." *Id.* at 270. "[T]he dominant purpose of the transaction was not merely the purchase by [Tri–State] of tangible written news reports, but rather the valuable right and privilege of broadcasting to its listeners news supplied by [UPI, a] reputable news information service." *Id.* Finally, the *May* court cited *Bichel Optical Lab., Inc. v. Marquette National Bank*, 336 F.Supp. 1368 (D.Minn. 1971), which stands for the idea that money-lending is a service.

Among the factual situations that the *May* court noted were more difficult were those in *Morning Pioneer, Inc. v. Bismarck Tribune Co.*, 493 F.2d 383 (8th Cir. 1974). The *Morning Pioneer* court dis-

cussed in dictum the potential for newspapers to be deemed a commodity. *Id.* at 389 n. 11. Another hard case discussed in *May* was *SCM Corp. v. Xerox Corp.,* 394 F.Supp. 384 (D.Conn.1975). In *SCM,* the putative commodities were the copiers leased by Xerox. *Id.* at 385. SCM argued that because the lease price was calculated on a per-unit-copied basis, the nature of its agreement with Xerox caused the copies to become commodities. *Id.* The court ultimately rejected that theory, deeming the dominant aspect of the transaction to be the service of copying, particularly because Xerox did not provide the paper on which copies were made. *Id.*

Defendants argue that credit reports should be deemed a service for a number of reasons. They assert that the information they store is not in the form of credit reports, but rather is a collection of constantly updated data points, which are gathered from tens of thousands of sources, including credit grantors such as banks, credit card companies and collection agencies. Decl. of David A. Browne ¶ 6; Decl. of Margaret Fortson Leslie ¶ 4; Decl. of Patricia Malloy ¶ 2. Based on this data, Defendants assemble and deliver a credit report on demand from customers. Thus, there is no prepared credit report waiting on the shelf to be taken down and delivered at any given time before a customer's request; instead, each credit report is unique. Browne Decl. ¶ 12; Leslie Decl. ¶ 12; Malloy Decl. ¶ 8. Indeed, each time a credit report is generated, the next credit report for the same individual will be different because it will reflect the preceding inquiry as part of the report. Browne Decl. ¶ 9; Leslie Decl. ¶ 6; Malloy Decl. ¶ 8. Defendants also argue that the credit reports delivered by each of them differ because of their varying databases and different computer algorithms involved in the selection and sorting of data to be included in the reports. Browne Decl. ¶ 13; Malloy Decl. ¶ 8. Because of

this tailoring and the variability of each individual report, Defendants argue that what they provide is the service of collecting, sorting, and delivering data in the form of credit reports.

Plaintiffs have not disputed the factual allegations set forth above. Thus the Court assumes that these material facts are admitted to exist without controversy. Local Rule 56–3. Instead, Plaintiffs focus on the fact that the invoices they receive for Defendants' credit reports characterize those reports as products, with individual product codes. Decl. of Paul Wohkittel ¶ 4; Decl. of Gary Kassan ¶ 4. Plaintiffs also point to examples of publications on Defendants' internet web sites that refer to credit reports as products, not as services. Decl. of Michael J. Flannery ¶¶ 2–4. They note that the CEO of Equifax has referred to credit reports as products in public speeches. *Id.* ¶ 5. Plaintiffs have also submitted an affidavit from an expert economist who rendered the opinion that credit reports are a tangible good, although acknowledging that "Defendants are engaged in the production of information." Decl. of Dr. John Solow ¶¶ 2, 6.

Plaintiffs assert that this evidence is sufficient to create a genuine issue of material fact that makes summary judgment inappropriate. Plaintiffs' focus on Defendants' invoices and public statements referring to credit reports as products is based on the Ninth Circuit's suggestion that cost breakdowns on billing invoices might be one of many factors for consideration. *May Dep't Store,* 637 F.2d at 1215. The Court finds Plaintiffs' reliance on the Ninth Circuit's language in *May* misplaced. The Ninth Circuit stated only that the breakdown of costs on billing invoices "*might* be [among] other factors for consideration." *Id.* (emphasis added). While the Court takes into consideration Defendants' invoices and public statements regarding the

credit reports, such evidence must be balanced against the unchallenged factual allegations set forth by Defendants.

Ultimately, the boundary between services and goods in the information age is a blurry one. Even the most traditional goods require the expenditure of labor in their creation. Thus, part of the value of the lump of coal referred to previously represents the labor involved in mining the coal and bringing it to market. Similarly, in *Kirkwood*, the generation of electricity required the expenditure of labor and capital to create the electricity which was deemed to be a commodity in the ultimate form in which it was sold. 671 F.2d at 1181–82. While electricity is clearly the sort of thing that can be deemed a commodity, credit reports are problematic in several respects. First, the evidence shows that the actual credit reports sent out by Defendants are assembled on demand. Thus, for each credit report requested, Defendants must cull the relevant data from their databases. This individualized aspect militates for the credit report to be viewed as a service rather than a good.

Another difficulty with defining credit reports as goods lies in the character of information as non-rivalrous. This is a significant difference between credit reports and electricity; while both credit reports and electricity require expenditure of time and energy to produce, the use of data in credit reports does not exhaust the data, unlike the use of electricity.

The major difficulty with defining credit reports as goods is their uniqueness; no two credit reports, even of the same customer, are identical. Each report is created by collecting and sorting tens of thousands of data points, including information regarding a previously generated credit report. Additionally, each Defendant uses different algorithms to process these data points and generate credit reports. Plain-

tiffs' attempt to characterize credit reports as tangible goods by analogizing the reports to online versions of books only highlights the uniqueness of credit reports. Plaintiffs point out that online books are tangible goods, even though they are not in a tangible form. Plaintiffs' expert notes that he relied upon an online version of Adam Smith's *Wealth of Nations*, a book written in 1776, in preparing his declaration. Solow Decl. ¶ 7. The information contained in that book has not changed in over 200 years; in contrast, a credit report will contain different information than a previously generated credit report about an individual, even if the two credit reports are generated within days of each other. Indeed, the major value of a credit report is the constantly changing and updated consumer-specific information contained within it.

Based on the material facts set forth by Defendants concerning the collection of data for the generation of unique credit reports, which have not been contested by Plaintiffs, the Court finds that the dominant nature of Defendants' transactions is the service of collecting, sorting, and delivering data in the form of credit reports. Plaintiffs' factual allegations concerning Defendants' characterization of credit reports as "products" on invoices and their web sites are insufficient to raise a genuine issue of material fact concerning the dominant nature of credit report transactions. Summary judgment for Defendants is appropriate at this stage in the litigation because Plaintiffs have failed to set forth specific, existing facts that might be obtained through further discovery, which would be essential to defeating a motion for summary judgment. *See California ex rel. Cal. Dep't of Toxic Substances Control*, 138 F.3d at 779. Therefore, the Court GRANTS Defendants' motion for summary judgment on Count III of the TAC.

## V. DISPOSITION

For the reasons stated above, the Court hereby (1) DISMISSES WITH PREJUDICE the UCL claims in Count V brought by non-resident Plaintiffs against Defendants Equifax and Trans Union; (2) DENIES the motion to dismiss Count IV under the UPA against Defendant Experian; (3) DISMISSES WITH PREJUDICE Count I under Sherman Act section 2, DENIES Defendants' motion to dismiss all claims brought by the NCRA, but grants Defendants leave to refile the motion if the California Supreme Court holds that Proposition 64 has retroactive effect, and DENIES AS MOOT the motion to strike paragraph 124 of the TAC; and (4) GRANTS the motion for summary judgment of Count III under the Robinson–Patman Act.

IT IS SO ORDERED.